UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. C-10-883 |
| | § | |
| SCOTTY EUGENE RICHARDSON | § | |

**<u>ORDER</u>**

On November 4, 2010, the Court held a hearing in the above-styled action to address Defendant Scotty Eugene Richardson's Motion to Suppress Evidence. (D.E. 11.) For the reasons discussed below, Defendant's Motion is GRANTED.

**I.      Jurisdiction**

The Court has federal subject matter jurisdiction over this case pursuant to 18 U.S.C. § 3231, giving federal district courts subject matter jurisdiction over "all offenses against the laws of the United States," as Defendant is charged with possession with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(D).

**II.     Factual Background**

At approximately 2 P.M. on September 4, 2010, Defendant Scotty Eugene Richardson was traveling north on U.S. Highway 281 in a Ford F-150 pick-up truck with a camper shell.[1] Approximately 5 miles south of the Falfurrias Border Patrol Checkpoint, Texas Department of Public Safety Trooper Orlando Garcia ("Trooper Garcia") executed a traffic stop of Defendant on the basis that Defendant did not use his turn signal during a lane change in violation of Texas

---

[1] Unless otherwise noted, the information in the "Factual Background" section of this Order originates from the November 4, 2010 hearing on Defendant's Motion to Suppress ("Nov. 4 Suppression Hearing").

law.[2]  Trooper Garcia asked Defendant questions regarding his citizenship, vehicle registration, and travel plans.  Defendant responded that he had been in Weslaco, Texas doing re-modeling work and was traveling to San Antonio, Texas in order to determine whether his current boss might have more work for him in San Antonio.  Trooper Garcia checked and cleared Defendant's driver's license and vehicle registration.  He issued Defendant a warning.  Garcia then asked Defendant whether there were any drugs in the vehicle.  Defendant answered that there were not. Garcia asked for consent to search the vehicle, and Defendant denied the request.

Despite Defendant's refusal to grant consent, Trooper Garcia radioed the Border Patrol Checkpoint requesting back-up and a canine trained to detect narcotics.  Three other trooper vehicles soon arrived.  Defendant was detained for 10 minutes on the side of the road while they waited for the canine.  Approximately 20 minutes into the stop, the canine handler, Border Patrol Agent Allen Foster, arrived with his service canine Harry-E.  (D.E. 1, Attachment A.)  Agent Foster reported that the canine alerted to the right rear bumper of Defendant's car.  Agent Foster asked Defendant to open the back of the truck.  Defendant  agreed and opened the back of the truck.  The officers began tapping the truck looking for hidden compartments.  Approximately 28 minutes into the stop, an officer entered the cab of the truck and removed food and drinks in order to avoid distracting the dog, though did not search the interior of the cab.  (Nov. 4 Suppression Hearing.)

Despite their efforts, the officers were unable to find any drugs.  At this point, Trooper Garcia asked Defendant: "Why would you deny me consent if you don't have anything?" Defendant responded that he did not want his car torn up or his tools and paper work disorganized.  Soon after – approximately 30 minutes into the stop – Garcia released Defendant,

---

[2]  Section 545.104(a) of the Texas Transportation Code states: "[a]n operator shall use the signal authorized by Section 545.106 to indicate an intention to turn, change lanes, or start from a parked position."  TEX. TRANSP. CODE ANN. § 545.104(a) (1999).

and he was allowed to continue his drive north towards the Border Patrol Checkpoint.  Agent Foster also proceeded to the Checkpoint.

When he reached the Checkpoint, Defendant was stopped again by Border Patrol Agent Rogelio Gonzalez, the patrol agent stationed on primary in Defendant's lane.  Agent Gonzalez had just been informed by Agent Foster that his canine Harry-E had alerted to Defendant's vehicle five miles south of the Checkpoint.  (D.E. 1, Attachment A.)  Agent Gonzalez asked Defendant's citizenship and his business.  Defendant informed him that he was a United States citizen and of his purpose in traveling from Weslaco to San Antonio.  Gonzalez testifies that he found Defendant to be nervous.  Specifically, Defendant continually avoided eye contact and spoke in a low tones, shaky voice.  However, there was no additional alert by the narcotics detection canine stationed in primary during the primary phase of the Checkpoint stop.  (Nov. 4 Suppression Hearing.)

Nonetheless, Agent Gonzalez asked Defendant for consent to search his vehicle. Defendant gave his consent and was taken into the secondary search area.  Once in secondary, Gonzalez asked Defendant to exit the vehicle and sit on a bench.  Agent Foster joined them in secondary.[3]  While Agent Gonzalez continued to question Defendant, Agent Foster proceeded to search Defendant's vehicle.  The Government's report indicates that Agent Foster advised Gonzalez that his canine Harry-E alerted to the back seat of the truck, and that "Border Patrol Agents then moved the seat forward, and discovered three bundles wrapped in brown paper and green cellophane." (D.E. 1, Attachment A) (emphasis added).  Likewise, in his own post-investigation report on the incident, Gonzalez indicated that Agent Foster's canine alerted to the vehicle first and that the marijuana was subsequently found.  (Nov. 4 Suppression Hearing.)

---

[3] Agent Gonzalez testified that multiple agents ordinarily assist in a vehicle search at the Border Patrol Checkpoint and that Foster "took it upon himself" to help in this search.

However, in his testimony, Gonzalez revealed that, after speaking with Agent Foster, he learned that in fact the canine did not initially alert to the vehicle and that Foster searched the vehicle prior to any alert by his canine.  Following the discovery of the drugs, Foster ran the dog around the truck a second time.[4]

### III.    Procedural Background

Based on the evidence discovered in his truck, Defendant was charged with possessing with intent to distribute approximately 3 kilograms of marijuana in violation of 21 U.S.C. §841(a)(1) and 841(b)(1)(D).  (D.E. 1.)

Defendant filed a Motion to Suppress, seeking to suppress any evidence obtained as a result of the search of his vehicle at the Border Patrol Checkpoint.  (D.E. 11.)  Defendant argues that the initial search by Trooper Garcia violated his Fourth Amendment rights because Garcia lacked additional "reasonable suspicion" to carry out the un-consented to search following his issuance of a traffic warning, and that the subsequent detention was unnecessarily prolonged. (D.E. 11, p. 3-5.)[5]  Defendant argues that any evidence seized during the subsequent Border Patrol Checkpoint search must be excluded because it was the direct result of Defendant's prior illegal search and detainment, and that the Government has failed to meet its heavy burden to demonstrate that Defendant's consent to the second search was voluntary and freely given, or that it constituted an independent act of free will sufficient to purge the taint of the initial unlawful conduct.  (D.E. 11, p. 5-7.)

---

[4] When asked why Foster did this, Gonzalez stated he did not know.  Counsel for Defendant speculated that it might have been for the purpose of determining why the dog had not initially alerted to the drugs.  (Nov. 4 Suppression Hearing.)

[5] Defendant does not challenge the legality of the canine search of his vehicle.  In any case, a dog sniff does not constitute a search or seizure under the Fourth Amendment.  See United States v. Seals, 987 F.2d 1102, 1106 (5th Cir.1993).

The Government argues in response that Trooper Garcia's initial search of Defendant five miles south of the Checkpoint is "not relevant to the subsequent encounter with U.S. Border Patrol Agents at the Falfurrias Checkpoint." (D.E. 17, p. 2.) As such, Agent Gonzalez' subsequent search at the Border Patrol Checkpoint was entirely lawful, given that routine border searches may be conducted without probable cause or reasonable suspicion and that, in any case, Defendant gave valid consent to the search. (D.E. 17, p. 3-4.) In the alternative, the Government argues the search at the Checkpoint was lawful under the good faith exception to the exclusionary rule or the inevitable discovery exception to the exclusionary rule. (D.E. 17, p. 4-6.)

As noted above, the Court held a hearing on Defendant's Motion to Suppress on November 4, 2010. At the hearing, the parties argued their various positions. Agent Gonzalez and Trooper Garcia testified before the Court. The Defendant played a DVD of Trooper Garcia's initial stop, detainment and inspection of Defendant's vehicle.

**IV.    Discussion**

For the reasons discussed below, the Court concludes that the search of Defendant's vehicle at the Border Patrol Checkpoint was unconstitutional and that the evidence obtained in the course of this search must be excluded.

**A.    Trooper Garcia's Initial Detainment of Defendant Was Not Sufficiently Related in Scope to the Traffic Stop and Was Not Warranted by Additional Reasonable Suspicion**

The Court first considers whether Trooper Garcia's initial stop, detainment and inspection of Defendant's vehicle can be justified based on the standards articulated in Terry v. Ohio. 392 U.S. 1 (1968); see also Knowles v. Iowa, 525 U.S. 113, 117-118 (1998); United States v. Brigham, 382 F.3d 500, 506 (5th Cir. 2004) (the legality of a traffic stop is analyzed

under the framework articulated in <u>Terry</u>).   Under <u>Terry's</u> two-part "reasonable suspicion" inquiry, the Court must determine whether Trooper Garcia's action was: (1) "justified at its inception"; and (2) "reasonably related in scope to the circumstances which justified the interference in the first place."  <u>Terry</u>, 392 U.S. at 19-20; <u>Brigham</u>, 382 F.3d at 506-507.

In this case, the Government has met its burden to prove that Garcia's initial traffic stop was warranted under <u>Terry</u>.  Defendant does not dispute Garcia's testimony that he initially stopped Defendant due to Defendant's failure to use his turn signal while changing lanes in violation of Texas law.  (Nov. 4 Suppression Hearing.)  <u>See</u> <u>United States v. Lenz</u>, 162 Fed. Appx. 379, 382 (5th Cir. 2006) ("An officer may stop a motorist for a traffic violation even if, subjectively, the officer's true motive is to investigate unrelated criminal offenses.") (quoting <u>United States v. Sanchez-Pena</u>, 336 F.3d 431, 437 (5th Cir. 2003)).  Because this was a valid traffic stop, Trooper Garcia was permitted to request Defendant's license and registration and to run a computer check.  <u>See</u> <u>United States v. Shabazz</u>, 993 F.2d 431, 437 (5th Cir.1993); <u>see</u> <u>also</u> <u>United States v. Kelley</u>, 981 F.2d 1464, 1469 (5th Cir.1993).

However, the Government has not met its burden to demonstrate that any further detention or search of Defendant was justified by additional "reasonable suspicion."  The Fifth Circuit has explained that a detention during a valid traffic stop does not violate the detainees' Fourth Amendment rights when it exceeds the amount of time needed to investigate the traffic infraction that initially caused the stop, "so long as (1) the facts that emerge during the police officer's investigation of the original offense create reasonable suspicion that additional criminal activity warranting additional present investigation is afoot, (2) the length of the entire detention is reasonable in light of the suspicious facts, and (3) the scope of the additional investigation is reasonable in light of the suspicious facts, meaning that it is reasonable to believe that each crime

investigated, if established, would likely explain the suspicious facts that gave rise to the reasonable suspicion of criminal activity." United States v. Pack, 612 F.3d 341, 358 (5th Cir. 2010). In general, "once all relevant computer checks have come back clean, there is no more reasonable suspicion, and, as a general matter, continued questioning thereafter unconstitutionally prolongs the detention." U.S. v. Jackson, 517 F.Supp.2d 859, 868-69 (W.D. La. 2007) (citing Brigham, 382 F.3d at 510; United States v. Jones, 234 F.3d 234, 241 (5th Cir.2000); United States v. Dortch, 199 F.3d 193, 200 (5th Cir.1999), corrected on denial of rehearing, 203 F.3d 883 (5th Cir.2000)).

In Dortch, the Fifth Circuit was presented with a similar case to Defendant's. Following a valid traffic stop, officers ran computer checks on the driver's license and vehicle registration. 199 F.3d at 198. They then detained his car, without further basis, while they waited for a dog team to arrive. The Fifth Circuit held that while the initial stop and detainment to perform computer checks were valid, "[t]he Constitution was violated … when the detention extended beyond the valid reason for the initial stop. To be sure, [defendant] did not feel free to leave even after the officer had informed him that the computer check was completed, because the officers still held his license and rental papers and had told him they were going to detain his car until the dog team arrived." Id. Given that the detainment was not consensual or reasonably related to the purpose of the traffic stop, additional "reasonable suspicion" was required. The court found that, under the circumstances, "there was no reasonable or articulable suspicion that [defendant] was trafficking in drugs. The answers he and [his] passenger gave, even assuming they were suspicious, did not give rise to that inference." Id.[6]

---

[6] In Pack, the Fifth Circuit initially stated that Dortch's requirement that "reasonable suspicion" be supported by particular suspicion of a specific crime was abrogated by Brigham. Pack, 612 F.3d. at 355 (citing Brigham, 382 F.3d at 509, n. 8). However, the Fifth Circuit subsequently withdrew this portion of its opinion, stating that Dortch was not inconsistent with Brigham's holding that reasonable suspicion does not require suspicion of a particular

Here, Trooper Garcia completed all relevant computer checks, which came back clean. Trooper Garcia and the other officers then detained Defendant on the side of the ride for approximately twenty minutes while they waited for the canine to arrive and inspected his vehicle.   Yet, as in Dortch, the Government has failed to prove that, following his check of Defendant's license and registration, Trooper Garcia obtained facts providing him with "reasonable suspicion" warranting additional investigation.  Pack, 612 F.3d at 358.  Indeed, in their Response, the Government provides no justification for Trooper Garcia's actions at all, contending only that Garcia's prior traffic stop is "not relevant" to the subsequent encounter at the Border Patrol Checkpoint.  (D.E. 17, p. 2.)[7]

At the Suppression Hearing, Trooper Garcia testified that he found Defendant to be nervous – mainly because his fingers were shaking when he handed Garcia his license and because he was kicking rocks.  Garcia also stated that he found Defendant's purported reason for traveling to San Antonio unconvincing.  Specifically, he found it odd that Defendant said he was traveling to San Antonio without certainty that he would have work or anywhere to stay once he got there.   However, when asked on cross-examination whether Defendant's story about traveling to San Antonio for a re-modeling job contained any proven lies, Garcia indicated that it did not.  (Nov. 4 Suppression Hearing.)

Although they are frequently cited factors to justify continued detention of a motorist, minor nervousness and inconsistent statements are not, standing alone, sufficient to support a reasonable suspicion.   See Jackson, 517 F.Supp.2d at 878 (finding trooper's testimony that

---

crime, but only requires facts suggesting criminal activity may be afoot.  United States v. Pack, 622 F.3d 383 (5th 2010).  Regardless, this point of law is not relevant to the case at bar.  The Government pursues only a theory of reasonable suspicion based on possession of drugs.

[7] At the Suppression Hearing, the Court asked the Government if it wished to present additional briefing on this point.  The Government did not indicate that additional briefing was necessary and has presented no additional briefing to the Court.

defendant was nervous based on indicators such as failure to make eye contact and trembling hands "d[id] not amount to reasonable suspicion of drug trafficking or other illegal behavior.") (citing United States v. Santiago, 310 F.3d 336, 342 (5th Cir. 2002); U.S. v. Grier, 127 Fed.Appx. 712, 715 (5th Cir. 2005); see also United States v. Estrada, 459 F.3d 627, 631 (5th Cir. 2006) ("Mere 'uneasy feelings' and inconsistent stories between a driver and passenger do not constitute articulable facts that support a reasonable suspicion of drug trafficking.")

Nevertheless – based only on his sense that Defendant was nervous and that his story was unusual – Trooper Garcia detained Defendant on the side of the road for over twenty minutes while they waited for the canine to arrive and inspected his vehicle. Unlike in Dortch, there is no question that Defendant's detainment was an investigative detention, rather than a consensual encounter. Defendant had already denied Trooper Garcia's request to search his vehicle. Three other troopers besides Garcia soon arrived on the scene. Defendant could not have left even if he believed he could do so. This non-consensual detainment was not reasonably related in scope to the initial traffic violation and was not supported by additional reasonable suspicion of wrongdoing. As such, the Court finds that any detention of Defendant following the computer checks was unconstitutionally prolonged and in violation of Defendant's Fourth Amendment rights. Jackson, 517 F.Supp.2d at 868-69; Dortch, 199 F.3d at 200.

**B.      Fruit of the Poisonous Tree**

"Under the 'fruit of the poisonous tree' doctrine, all evidence derived from the exploitation of an illegal search or seizure must be suppressed, unless the Government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the Fourth Amendment violation." U.S. v. Rivas, 157 F.3d 364, 368 (5th Cir. 1998) (citing Brown v. Illinois, 422 U.S. 590, 602-03 (1975)); see also U.S. v. Martinez, 486

F.3d 855, 864 (5th Cir. 2007).  The marijuana obtained by Agent Gonzalez during his search of Defendant's vehicle at the Border Patrol Checkpoint was the direct result of the prior illegal stop. According to all accounts, prior to Agent Gonzalez' decision to stop and search Defendant, Agent Foster specifically pointed out Defendant's vehicle to Agent Gonzalez and informed Gonzalez that his canine had alerted to Defendant's vehicle five miles south of the Checkpoint. Although Agent Gonzalez stated at the hearing that he would have searched Defendant's vehicle even if Agent Foster had not given him this alert, as discussed further below, the Court does not find Agent Gonzalez' testimony to this effect credible.  (Nov. 4 Suppression Hearing.)  The evidence obtained in the second search must be excluded as "fruit of the poisonous tree" unless the Government meets its burden to demonstrate a break in the chain of events between the two stops.  Martinez, 486 F.3d at 864.

### C.   The Government Has Failed to Show Defendant's Consent Broke the Chain of Events Between the Fourth Amendment Violation and the Subsequent Search

The Government argues that because Defendant was released after the first stop and detention and freely traveled to the Checkpoint, and then gave consent to Border Patrol Agent Gonzalez to search his vehicle, these independent acts of free will broke the chain of events between the Fourth Amendment violation and the subsequent search, warranting an exception to the exclusionary rule.  (D.E. 17, p. 2-3.)

It is well established that "a subsequent consent to search may, but does not necessarily, dissipate the taint of a prior fourth amendment violation."  Martinez, 486 F.3d at 865 (quoting United States v. Jones, 234 F.3d 234, 242 (5th Cir. 2000)).  "A prosecutor who seeks to introduce the fruits of such a search has the burden of proving the consent was voluntarily given and not the result of duress or coercion."  U.S. v. Ruigomez, 702 F.2d 61, 65 (5th Cir. 1983).  In

evaluating consent given after a Fourth Amendment violation, "the admissibility of the challenged evidence turns on a two-pronged inquiry: 1) whether the consent was voluntarily and freely given; and 2) whether the consent was an independent act of free will.  The first prong focuses on coercion, the second on causal connection with the constitutional violation."  Id. (quoting United States v. Chavez-Villarreal, 3 F.3d 124, 127 (5th Cir.1993)).

In evaluating the first prong, voluntariness of consent, the Court examines all the circumstances to determine whether consent was given voluntarily and not "coerced by threats or force, or granted only in submission to a claim of lawful authority[.]"        Schneckloth v. Bustamonte, 412 U.S. 218, 233-234 (U.S. 1973).   The Court considers six non-dispositive factors in evaluating the voluntariness of consent: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and  level of the defendant's cooperation; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.  United States v. Richard, 994 F.2d 244, 251 (5th Cir. 1993).

In this case, the Court finds the Government has failed to meet its burden to demonstrate that Defendant's consent was voluntary.  Although Defendant gave consent and cooperated with Gonzalez and Foster's search of his vehicle at the Checkpoint, the facts suggest Defendant's custodial status was not truly voluntary and that Defendant was not aware of his right to refuse consent.  He had already refused Trooper Garcia's prior request to search his vehicle.  The result of his refusal was that he was detained on the side of the road for twenty minutes.  There is no reason to think Defendant would now believe he had a right to refuse consent.  This impression would have been compounded by Trooper Garcia's earlier comment: "Why would you refuse me consent if you don't have anything?" Defendant might reasonably have believed he could not

refuse a second time without risking self-incrimination.  Given these circumstances, the Court finds the Government has failed to prove that Defendant's consent was voluntary and not "granted only in submission to a claim of lawful authority[.]"  Schneckloth, 412 U.S. at 233-234; see also Dortch, 199 F.3d at 200 ("In the context of this prolonged unlawful detention, and in light of the fact that his previous refusals were seemingly ineffective, [defendant's] consent cannot be considered an independent act of free will.")

As to the second prong, causal connection between the violation and the consent, the Court finds the Government has also failed to meet its burden.

To determine whether the causal chain was broken, the Court considers: "(1) the temporal proximity of the illegal conduct and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the initial misconduct."  Martinez, 486 F.3d at 865 (quoting Chavez-Villarreal, 3 F.3d at 128).  In this case, all three factors weigh against the Government.

As to the first factor, there was immediate temporal and geographic proximity between the illegal stop and Defendant's consent.  The initial detention occurred approximately five miles south of the search at the Border Patrol Checkpoint and less than twenty minutes earlier.  (Nov. 4 Suppression Hearing.)

As to the second factor, there were no intervening circumstances that might have broken the chain between the illegal stop and the alleged consent: Defendant simply continued his intended drive north towards San Antonio.

As to the third factor, the purpose and flagrancy of the initial misconduct, the record suggests that at least part of the purpose of the initial detainment of Defendant was to obtain Defendant's consent, despite his refusal, to fully search his vehicle.  Trooper Garcia's comment – "Why would you deny me consent if you don't have anything? – suggests that he hoped by his

actions to extract consent from Defendant.  See Martinez, 486 F.3d at 865 (citing Jones, 234 F.3d at 243 (finding third factor satisfied where it was "clear that the purpose of the detention was to search the vehicles for narcotics"); United States v. Jaquez, 421 F.3d 338, 342 (5th Cir. 2005) (per curiam) (finding third factor satisfied where "very purpose of her unlawful stop was to secure his consent to search the vehicle")).

In sum, the Court finds the Government has failed to show Defendant's consent was voluntarily and freely given, or that there was a sufficient break in the causal chain between the first and second stops.  The evidence obtained in the search at the Border Patrol Checkpoint must be deemed the product of a Fourth Amendment violation and must be excluded.  Rivas, 157 F.3d at 368; Martinez, 486 F.3d at 864.[8]

> **D.      The Good Faith Exception Does Not Apply**

The Government argues that any illegality in the search of Defendant's vehicle is justified under the good faith exception to the exclusionary rule.  (D.E. 17, p. 4.)  Under the good faith doctrine, "evidence is not to be suppressed . . . where it is discovered by officers in the course of actions that are taken in good faith and in the reasonable, though mistaken, belief that they are authorized." U.S. v. De Leon-Reyna, 930 F.2d 396, 400-01 (5th Cir. 1991).  It is the burden of the "proponent of the evidence to urge that the conduct in question, if mistaken or unauthorized, was yet taken in a reasonable, good-faith belief that it was proper." U.S. v. Williams, 622 F.2d 830, 840 (5th Cir. 1980).  Importantly, "[t]he exception is not devised for the

---

[8] The Government also argues that Agent Gonzalez was justified in searching Defendant's vehicle even absent probable cause, reasonable suspicion, or a search warrant because, under the border-search doctrine, "a routine search made at the border or its functional equivalent may be made without probable cause or any suspicion to justify the search." U.S. v. Cardenas, 9 F.3d 1139, 1148 (5th Cir. 1993) (citing United States v. Sandler, 644 F.2d 1163, 1167-69 (5th Cir.1981) (en banc)).  However, if the evidence was procured as a result of exploitation of the illegal search, then the Government still must meet its burden to demonstrate that there was some break in the chain sufficient to purge the taint of that violation.  Martinez, 486 F.3d at 865.  As discussed, the Government has failed to demonstrate that Defendant's consent was effective to purge the taint in this case.  As discussed below, the Government has also failed to demonstrate that the "inevitable discovery" exception applies.  Therefore, even if no consent was required, the evidence must be excluded as fruit of the poisoned tree.

unlawful conduct of all officers who mean well. The good faith belief must be grounded in objective reasonableness." U.S. v. Whaley, 781 F.2d 417, 421 (5th Cir. 1986).

The Government argues the good faith exception applies because Agent Gonzalez acted in the reasonable, though mistaken belief that he was authorized to search Defendant's vehicle. The Government describes the sequence of events as follows: Agent Foster altered Gonzalez that his canine had previously alerted to Defendant's pick-up truck.   Gonzalez found Defendant nervous while questioning him.   Based on both these factors, Gonzalez asked for consent to search Defendant's vehicle, which Defendant gave.   Gonzalez then instructed Defendant to park in the secondary inspection lane for closer inspection.   "Once in secondary, based on Defendant's consent, Agent Foster searched the Defendant's truck and discovered the marijuana behind the seat."  (D.E. 17, p. 5.)  The Government argues that, based on this course of action, Agent Gonzalez acted with an objectively reasonable good faith that he was legally justified in stopping and searching Defendant, and that, as such, the evidence seized at the Checkpoint should be admissible.

The Government's argument that its agents acted in good faith fails.  Even if Agent Gonzalez acted without awareness of a prior illegal detention, and therefore believed he was fully authorized to search Defendant's vehicle, Agent Foster was the agent who performed the search of Defendant's vehicle.  Agent Foster was present at the initial search five miles south of the Checkpoint.   Though he did not necessarily know the unlawful circumstances of the detention, he knew Defendant had been detained.  The Government has not met its burden to demonstrate that Foster acted in the reasonable, though mistaken, belief his actions were lawful. Indeed, there are indicators that he did not.

In his report on the search of Defendant's vehicle in secondary, Agent Gonzalez indicated that Foster's canine <u>first</u> alerted to the drugs in Defendant's vehicle, and that only then did Foster search the truck.  However, Gonzalez' testimony at the hearing shows this to be inaccurate.  In his testimony, Gonzalez stated that after writing his report he learned from Agent Foster that during the search in secondary Agent Foster's canine did <u>not</u> initially alert to Defendant's vehicle.  Rather, Foster searched the vehicle and discovered the drugs prior to any alert by his canine.  After he located the drugs, Foster then ran his canine around the truck a second time.  It is not clear whether this second run-around resulted in an alert, or precisely why Agent Foster chose to do this.  (Nov. 4 Suppression Hearing.)

Not only does Agent Foster's conduct indicate some awareness of the impropriety of his actions in searching Defendant's vehicle, the inconsistencies between Agent Gonzalez' report and reality indicates some awareness on the part of Gonzalez that their actions were not properly authorized.  As such, the Court finds the Government has failed to meet its burden to prove its officers acted in the reasonable, though mistaken, belief their actions were authorized.  <u>De Leon-Reyna</u>, 930 F.2d at 400-01.  The good faith exception does not apply.

### E.    The Inevitable Discovery Doctrine Does Not Apply

Another limit on the general rule that evidence discovered as a direct result of an illegal search must be excluded is the inevitable discovery doctrine.  The Government argues the evidence should be admitted even if it was illegally obtained because it would have been inevitably discovered through independent, lawful means.  <u>See</u> <u>Nix v. Williams</u>, 467 U.S. 431, 443-44 (1984).  The inevitable discovery rule applies if the Government demonstrates by a preponderance of the evidence that (1) there is a reasonable probability the contested evidence would have been discovered by lawful means in the absence of police misconduct and (2) the

Government was actively pursuing a substantial alternate line of investigation at the time of the constitutional violation.  United States v. Jackson, 596 F.3d 236, 241 (5th Cir. 2010) (citing United States v. Lamas, 930 F.2d 1099, 1102 (5th Cir. 1991)).

The Government argues that, even absent Agent Foster's alert, Agent Gonzalez would have conducted a routine investigation on Defendant when he approached the Checkpoint based on Defendant's signs of nervousness; would have inevitably have sent him into secondary inspection; and would inevitably have discovered the drugs.  (D.E. 17, p. 6.)  Gonzalez testified during the Suppression Hearing that Defendant was avoiding eye contact and speaking in a low toned, shaky voice.  When asked by the Court whether he would have stopped Defendant regardless of Foster's alert, Gonzalez responded that he would have done so.   (Nov. 4 Suppression Hearing).

The Court cannot conclude from the record that there is a "reasonable probability" the evidence would have been discovered absent Agent Foster's alert.  As already noted, the Court does not find credible Agent Gonzalez' testimony that he would have stopped Defendant based merely on these minor signs of nervousness.  Nervousness, standing alone, is not generally sufficient to support a reasonable suspicion.  Santiago, 310 F.3d at 342; Estrada, 459 F.3d at 631. Without credible and convincing testimony from Gonzalez that Defendant's nervousness would have compelled him to take Defendant into secondary, the Court has no basis from which to conclude that Gonzalez would have done so.  Even if Gonzalez had decided to take Defendant's vehicle into secondary, there is not a "reasonable probability" he would have discovered the drugs.  Not all the canines alerted to the marijuana in Defendant's truck.  Indeed, it was established at the hearing that the canine stationed at primary in the Checkpoint did not alert to Defendant's vehicle.  (Nov. 4 Suppression Hearing.)  During their initial search of Defendant's

vehicle five miles south of the Checkpoint, multiple officers were unable to discover the drugs – even with the benefit of a canine alert.  Notably, it was Agent Foster, not Agent Gonzalez, who ultimately found the drugs behind the seat of Defendant's vehicle.  Unlike Agent Foster, who was present during the initial inspection, Agent Gonzalez would not have known where, or where not, to look.

As such, the Court finds the Government has failed to meet its burden to prove there was a reasonable probability the evidence would have been discovered through independent, lawful means.  Jackson, 596 F.3d at 241.  The inevitable discovery exception to the exclusionary rule does not apply.

## V.      Conclusion

For the reasons stated above, Defendant's Motion to Suppress (D.E. 11) is GRANTED. The evidence listed in the indictment, obtained as a result of Agents Gonzalez and Foster's search of Defendant at the Falfurrias Border Patrol Checkpoint, is suppressed. (D.E. 1)

SIGNED and ORDERED this 23rd day of November, 2010.

_____
Janis Graham Jack
United States District Judge